

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| CARLA E. UMLAND, | ) | |
| | ) | |
| Respondent, | ) | WD81994 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | November 19, 2019 |
| LIZABETH G. GRAHAM, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Shane T. Alexander, Judge

Before Division Three: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge and Anthony
Rex Gabbert, Judge

Appellant Lizabeth Graham ("Graham") appeals the judgment of the Circuit Court
of Clay County in an action to partition property held jointly with her partner, Carla
Umland ("Umland"). Graham alleges that the circuit court erred when it failed to properly
credit her for the down payment she made towards the purchase of the home, failed to
account for a period of time in which she was solely responsible for the payment of the
mortgage, and in finding the parties jointly responsible for the balance of a home equity
line of credit. We affirm.

# Factual Background[1]

Graham and Umland began living together in the fall of 1994 at Graham's residence, located at 8871 E. 52 Terr., Kansas City, Missouri ("8871 Property"). From the fall of 1995 until at least January 2016, they committed themselves to live together as a married couple, including to emotionally and financially support one another, living together through retirement until death. This included a proposal and exchange of rings, although, at the time, the State of Missouri did not allow same-sex couples to marry. Beginning in at least 1998, the parties began contributing both of their incomes into a joint bank account from which their joint household and personal expenses were paid. Most of their joint expenses, including the mortgage payment, utilities, and investments, were paid from the joint account until it was closed by Graham in September 2016.

In January 1999, the couple purchased a residence, commonly known as 2301 Redbud Drive, Liberty, Clay County, Missouri ("Redbud Property"), titled to them as joint tenants with the right of survivorship and subject to a mortgage in both of their names. Graham contributed $50,000.00 to the down-payment on the property, which was derived from the sale of the 8871 Property titled solely to Graham. The payments and obligations secured by the Redbud Property were paid from joint earnings until at least 2013, when Umland left her employment at Proctor and Gamble.

After Umland ceased working for Proctor and Gamble, the parties agreed that Umland would form and operate two business entities, All Trades Home Maintenance and

---

[1] "We view the evidence and all reasonable inferences from the evidence in the light most favorable to the judgment." *Holt v. Rankin*, 320 S.W.3d 761 S.W.3d 761, 763 n. 3 (Mo. App. W.D. 2010).

Repair, LLC and Aden Fire and Safety, LLC. The businesses were solely owned by Umland to shield the couple's joint assets, but they were to be operated for the couple's joint benefit. The parties jointly obtained a home equity line of credit ("HELOC") to cover the startup costs and business expenses. The HELOC was secured by a Second Deed of Trust on the Redbud Property. The original credit limit on the HELOC was $90,000. Due to business losses, the parties later increased this limit to $170,000. The businesses ultimately proved to be unsuccessful. At the time the Redbud Property was sold the HELOC was paid in full in the sum of $98,000.

The couple shared various other accounts held as joint tenants with the rights of survivorship as well as bank accounts and retirement accounts held individually. They also held title jointly to several motor vehicles and trailers. On September 19, 2002, Graham and Umland entered into an "Estate Plan and Revocable Trust of Lizabeth G. Graham and Carla E. Umland," which provided, among other things, that "all property subject to this Trust during the joint lives of the Grantors shall be beneficially owned by them Tenants by the Entirety." The division of these assets are not at issue in this appeal.[2] Additionally, the couple shared one daughter, an adult at the time of the trial.

The court entered its Judgment on May 10, 2018 ("Judgment"). After dividing all of the assets, the trial court ordered Graham to pay Umland a payment of $272,005.00 in order to equalize the division of assets. As relevant to this case, the court found that the net proceeds from the sale of the Redbud Property should be divided equally between the

---

[2] Because the division of these assets is not the subject of this appeal, we do not address whether unmarried persons can legally attempt to title assets as tenants by the entirety. These assets were in fact held in the name of the trust and divided pursuant to its terms.

3

parties. Further, the court found that the HELOC, which was secured by the Redbud Property, was a joint debt for which both parties were equally responsible, and therefore, was equally considered toward each party in the final division of the assets. This appeal followed.

## Standard of Review

> "A partition action is a court tried action and is thus reviewed pursuant to *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976)." *Hoit v. Rankin,* 320 S.W.3d 761, 765 (Mo. App. W.D.2010). "'[W]e will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *Id.* (quoting *Clark v. Dady,* 131 S.W.3d 382, 386 (Mo. App. W.D.2004)). "We defer to the trial court's findings of fact because of its superior ability to assess the credibility of witnesses." *Id.*

*Felderman v. Zweifel*, 346 S.W.3d 386, 388 (Mo. App. W.D. 2011).

## Discussion

In her sole point on appeal, Graham raises three allegations of error generally related to the division of the net proceeds from the sale of the Redbud Property. The Redbud Property was sold in 2017, during the pendency of these proceedings, resulting in $145,315.88 net cash proceeds from the equity in the property.[3] Graham alleges first that the circuit court erred in failing to give her credit for a $50,000 down-payment she made towards the purchase of the Redbud Property because this payment was derived from the sale of Graham's home, the 8871 Property, in which Umland had no ownership interest. Second, that the court erred in failing to give her credit for $36,918 in mortgage payments

---

[3] By agreement of the parties to this action, the proceeds are held in counsel's trust account pending the finality of this litigation. Originally there were additional parties to this action, who were dismissed by agreement of the parties prior to trial and are not subject to this appeal.

4

that she made from May of 2013 until July of 2017, or at least credit her with the reduction in the principal amount of the mortgage during this period because these payments were made either after Umland was self-employed and not contributing to expenses or after the relationship had ended. Third, that the court erred in failing to give Graham credit for the $98,000 HELOC on the Redbud Property because the parties had agreed that Umland was to be solely responsible for this debt.

As to the first two allegations of error, the circuit court found that Graham demonstrated a donative intent in making the down-payment on the home and in making these additional payments towards the mortgage. The Redbud Property was jointly purchased by the parties, the property was titled in joint names and the mortgage was a joint responsibility entered into by both parties. There is a presumption that, when a deed is silent, co-tenants hold equal ownership shares in the property. *Hoit v. Rankin*, 320 S.W.3d 761, 772 (Mo. App. W.D. 2010). "[U]nequal contributions may be explained by evidence that the co-tenant contributing a greater amount toward purchase intended the disparity as an enforceable gift, a determination which may be influenced by evidence of the nature of the relationship [between] the co-tenants." *Felderman*, 346 S.W.3d at 389 (quoting *Hoit v. Rankin*, 320 S.W.3d 761, 772 (Mo. App. W.D. 2010)). "Evidence of a relationship between co-tenants suggestive of donative intent is relevant evidence. . . ." *Id.*

In *Felderman*, the defendant purchased a property and then invited his ex-wife to move to Missouri and live with him on the property. *Felderman*, 346 S.W.3d at 388. Following the move, the defendant executed a Warranty Deed to himself and his ex-wife as joint tenants with the right of survivorship. *Id*. The defendant testified at trial that his

5

ex-wife had paid nothing for the property, and when he executed the deed, he did so with the understanding that she would sell a property she owned in New Mexico and pay for half of the original purchase price, although ultimately she paid nothing and had "very little, if any, money invested" in the property. *Id.* at 389. The court, however, found the defendant had invited his ex-wife to come and live on the property and that he had promised her that he would deed half of the property to her. *Id.* at 390. The couple cohabitated on the property for eighteen months. *Id.* The circuit court found ex-wife's testimony more credible on the issue of donative intent, and this Court deferred to that determination. *Id.* Accordingly, this Court affirmed the circuit court's finding of donative intent and a joint tenancy interest, despite ex-wife having made little, if any, contribution to the property. *Id.*

In this case, the relationship between the parties was significantly stronger than that in *Felderman*. Both Umland and Graham testified that they lived together in a marriage-like relationship for several years prior to the sale of the 8871 Property and the purchase of the Redbud Property. The couple gave birth to a child[4] the same year that they sold the 8871 Property and purchased the Redbud Property. They opened a joint bank account, and Graham would pick up paychecks for both she and Umland and deposit the checks in the joint account. That joint account was used to pay household expenses including the mortgage secured by the 8871 Property. While Graham owned the 8871 Property prior to the relationship and it was titled in her name individually, Umland testified that she was responsible for substantial renovations to the home including removing and installing new

---

[4] Umland gave birth to a daughter by artificial insemination in 1998. Graham could not legally adopt the child at the time of her birth but did so in 2008, when it became legal for same sex couples to adopt in the State of Missouri.

6

carpeting, tiling the basement, installing sinks and faucets, painting both the interior and exterior of the home, and ultimately preparing the house to be sold. Umland testified the 8871 Property was sold for approximately $90,000, and there was approximately $30,000 left on the mortgage. Graham believed the net profit from the sale of the 8871 Property was between $50,000 and $55,000. Graham took $50,000 of the net proceeds and placed a down-payment on the Redbud Property. According to Umland's testimony, there was no discussion that the $50,000 would be returned if the relationship failed while Graham testified that she said at the time, "[i]f anything happens" she wanted the $50,000 down-payment back. Umland testified that with respect to the ownership of the Redbud Property "[w]e discussed it would be equal. Everything was equal."

In contrast to *Felderman*, Graham cites to several cases where the court, in dividing the property, did just what Graham advocates, allocated proceeds of the sale of real estate based on the percentage of each parties contribution. For example, Graham relies on *Williams v. Williams*, 990 S.W.2d 665 (Mo. App. E.D. 1999). In *Williams*, husband and wife were divorced in 1973, but the marital home was not divided by the divorce decree. *Id.* at 667. Wife resided in the home, and nearly 24 years after the divorce, husband brought a partition action to partition the property. *Id.* The trial court found that husband's failure to seek a remedy until 24 years after the divorce and 11 years following a modification of the divorce decree was patently unfair to wife and granted wife the entirety of the marital home. *Id.* at 668. On appeal, the Eastern District of this Court found that the judgment improperly denied husband his interest in the property and remanded the case for the trial court to determine the respective contributions made to the home.

7

> Each party begins with a half of a share in the property in the trial court's initial calculation of individual interest. *Vickers v. Vickers*, 762 S.W.2d 482, 483 (Mo. App. E.D.1988). However, under the dictates of *Brooks* [*v. Kunz*, 637 S.W.2d 135, 139-40 (Mo. App. E.D. 1982)]*,* if one co-tenant disproportionately augments the value of the property, that co-tenant is entitled to contribution from the other. *Id.*

*Williams*, 990 S.W.2d at 668. This discussion from *Williams* represents the proper partition of the property where there is no evidence of donative intent. In *Montgomery v. Roberts*, 714 S.W.2d 234, 235 (Mo. App. E.D. 1986), also cited by Graham, landowner's sister filed a petition to quiet title after property owner's death. The landowner had previously transferred the property to a woman[5] he was living with at the time of his death. *Id.* The court found that "[s]ince there was no evidence of donative intent on [landowner's] part, or the existence of a family relationship, the property had to be apportioned according to the contribution of each towards the acquisition of the property." *Id.* 236.

*Montgomery* makes clear that donative intent and family relationship do factor into a courts consideration in the apportionment of property. As with *Felderman*, the nature of Graham and Umland's relationship was sufficient to support the circuit court's finding that Graham had a donative intent when she made the down-payment for the jointly titled home as well as made additional payments toward the principle. Umland testified that the extensive renovations that she made to the 8871 Property increased its value by means other than cash contributions. The couple treated all their assets as jointly owned and made payments from a joint bank account to which they both contributed their salaries. When

---

[5] Although a contested issue, the circuit court found that the landowner and woman were unmarried. *Id.* at 235.

8

Umland stopped contributing income to the joint bank account, it was in furtherance of a business the parties started by agreement. Umland's testimony supported a finding that Graham knew of the consequences and risks of Umland starting a business and agreed to support the couple financially while Umland was attempting to start and grow a new business. While Graham countered this testimony, the circuit court was free to disbelieve Graham's testimony. *Blair v. Blair*, 147 S.W.3d 882, 886 (Mo. App. W.D. 2004) ("The trial judge has absolute discretion as to the credibility of witnesses and the weight of their testimony is a matter for the trial court, and its findings on witness credibility are never reviewable by the appellate court.")

There is a presumption that tenants in common hold equal shares of property they own. The circuit court did not error in finding that Graham failed to present sufficient credible evidence to rebut this presumption.

As to the HELOC, Graham argues that the parties had previously agreed that Umland would be solely responsible for the debt because it was solely for the benefit of Umland's businesses. Graham contends that the court "erroneously makes a finding that Plaintiff denied the existence of an agreement that the HELOC was her 'sole responsibility.'" In her briefing, Graham states "[Umland] clearly testified on cross-examination that the HELOC was her responsibility." While true that Umland did respond "yes" to a question of whether the HELOC was her "responsibility," a close review of the transcript, in the cited testimony and its surrounding testimony, shows that, at best, Umland's testimony was conflicting. When read in its totality, Umland's claim of responsibility could properly be interpreted by the fact finder to be related to the fact that

9

the HELOC was used to provide funding for her businesses and she was responsible for managing the businesses and making payments on the line of credit from those businesses. When specifically asked about whether Graham told Umland that "the note belongs to you," suggesting sole liability for repayment, Umland testified: "I don't recall that." Again, as noted above, the circuit court was free to disbelieve Graham's testimony. *Blair*, 147 S.W.3d at 886. It was also free to believe Umland's testimony, both in direct and on cross-examination, that there was never any agreement that the HELOC would be repaid solely by her.

The HELOC was taken out jointly by Umland and Graham and secured by their real property. According to Umland's testimony, the couple knew that the businesses might lose money. When the HELOC's credit limit was increased, it was again done jointly by the couple. Umland testified that she regularly discussed business purchases with Graham including a $10,000 van purchased for Umland's business, paid for by the HELOC, but that was jointly titled between the women. Umland testified that the HELOC was opened for their joint benefit. Additionally, money from the HELOC was used to fix up a home previously owned by Graham's mother, which was renovated by Umland and eventually sold. Money from the HELOC was also used to prepare the Redbud Property for sale after Umland and Graham's separation.

It is clear from the Judgment that the court believed that the couple intended to live as a married couple sharing their finances and pooling their assets. The court specifically found that the Graham had equal access to all bank statements concerning the HELOC and that the parties agreed to take the business risk together. In effect, the court simply chose

10

to disbelieve Graham's assertion that the HELOC was to be Umland's sole responsibility, a finding supported by the record. As noted above, we will defer to the circuit court on questions of witness credibility.

Graham attempts to challenge Umland's credibility by noting that Umland failed to disclose certain assets in her original Petition and to note that some assets were titled individually. While such issues might call into question Umland's credibility, these issues were fully presented to the circuit court, which found, on the question of donative intent and responsibility for the HELOC loan, Umland's evidence was more credible. This court does not revisit such a determination on appeal.

## Conclusion

For the reasons stated above, we affirm.

_____
Gary D. Witt, Judge

All concur

11